UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFERY JOHNSON, | |
| Plaintiff, | |
| v. | No. 21 CV 3285 |
| ACCENTURE LLP, | Judge Manish S. Shah |
| Defendant. | |

MEMORANDUM OPINION AND ORDER

Plaintiff Jeffery Johnson worked for defendant Accenture LLP as an associate manager. A client's employee was combative and disrespectful, and another manager at Accenture suggested that Johnson change the pitch of his voice so as to accommodate the client. Johnson complained of discrimination, and was told not to return to that client's project. He had difficulty finding other work at Accenture and spent long periods unassigned to any client project. The company fired Johnson. Plaintiff sues Accenture for race discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981. Defendant moves for summary judgment under Federal Rule of Civil Procedure 56. For the reasons discussed below, the motion is granted.

## I. Legal Standards

Summary judgment is appropriate when there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bunn v. Khoury*

*Enterprises, Inc.*, 753 F.3d 676, 681–82 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). I construe all facts and reasonable inferences in favor of Johnson, the nonmoving party. *Robertson v. Dep't of Health Services*, 949 F.3d 371, 377–78 (7th Cir. 2020) (citation omitted). Accenture bears the burden of establishing that the summary judgment standard is met, but Johnson must put forward enough evidence to establish the essential elements of his claims and show that he can carry his burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.   Background

### A.   Accenture's Policies and Procedures

Accenture contracted with other companies to provide professional services, and fulfilled those contracts by assigning employees to client projects. [28] ¶ 4.[1]

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from defendant's response to plaintiff's Local Rule 56.1 statement, [39], (where both the asserted fact and the opponent's response are in one document), plaintiff's response to defendant's statement, [33], and defendant's statement, [28]. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see, e.g.*, [28] ¶¶ 4, 34–35, 45, 48, 54, 57, 61, 73–75, 78–80. I ignore legal arguments in the statements of facts and additional facts included in response to an asserted fact that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(d)(4), (e)(2); *see, e.g.*, [33] ¶¶ 16, 18, 20, 44, 46–55, 57–58, 62–63, 78; [39] ¶ 30. Plaintiff repeatedly violates the local rule in his statement of additional facts, relying on paragraph-length facts with citations to large sections of the record. *See* [39]; N.D. Ill. Local R. 56.1(d)(1–2). Plaintiff also exceeds the number of additional facts allowed. *See* [39] ¶¶ 41–44. The case is not so factually complex as to require more than the forty statements of fact allowed by the rule, and I decline to consider plaintiff's excess statements of fact. Plaintiff repeatedly asserts facts by reference to his deposition, but many of the cited portions of the transcript weren't filed on the record. *See* [28-3]; [34-2]. Unsupported assertions are disregarded. *See* N.D. Ill. Local R. 56.1(d)(2–3); Fed. R. Civ. P. 56(c)(1)(A); *see, e.g.*, [39] ¶¶ 24, 35, 40. I also consider "other materials in the record" as appropriate. Fed. R. Civ. P. 56(c)(3).

Accenture employees needed to apply and interview for assignments. *Id.*[2] After an employee applied to a role, his resume was reviewed by the client team that posted the opening. *Id.* ¶ 8. Hiring managers chose employees on a project-by-project basis, and considered a variety of factors in choosing who to staff, including assessments of a candidate's earlier performance. *See* [39] ¶¶ 9–10; [28] ¶ 8.

When a project ended or someone left a team, an employee could be placed on the company's "bench," meaning that they weren't currently assigned to a project. [28] ¶ 5. Employees on the bench didn't work on client projects, but were paid their full salary and benefits. *Id.* ¶ 9. Benched employees were required to find new roles within the company, and Accenture assigned support staff to connect employees to new work that matched their skill sets. *Id.* ¶¶ 6–7. Accenture tracked employee time on the bench, and had guidelines for employees who didn't work on client projects for extended periods of time. *Id.* ¶ 11. Employees were supposed to focus on securing their next assignment during the last two weeks of a project. *Id.* ¶ 12. Employees who were on the bench had regular discussions with Accenture staff to focus on finding

---

[2] Johnson's hearsay objection, *see* [33] ¶ 4, is overruled. The portion of the declaration at issue—made by Accenture Talent Fulfillment Specialist Lisa Quiroz—is not hearsay, because Quiroz had personal knowledge of Accenture's staffing procedures and her testimony, if offered in court, would be admissible. *See* [28] ¶ 13; [28-2] ¶ 5; Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (citations omitted) (Declarations are admissible in summary judgment proceedings to establish the truth of the matter asserted, provided that the testimony would be admissible if the declarant were testifying live.). Accenture's managing director said that project managers had authority to decide who to hire, *see* [34-4] at 17, but that doesn't controvert the fact asserted: that Accenture employees needed to apply and interview for work on client projects. *See* [28] ¶ 4. Defendant's fact is admitted.

more work. *See id.* ¶¶ 12–14; [39] ¶ 10. Benched employees received warnings that a failure to find a new project could lead to termination, and employees on the bench for eight consecutive weeks were supposed to be fired. *See* [28] ¶¶ 12, 14. Support staff were responsible for notifying the company's diversity and inclusion representative when Black employees (among others) had difficulty securing a position on a project. [39] ¶ 11. The diversity and inclusion representative encouraged project managers to staff candidates with diverse backgrounds. *Id.*

Accenture had policies prohibiting racial discrimination, harassment, and retaliation. [39] ¶ 4. If an employee wasn't selected for an assignment, a supervisor failed to evaluate someone, or a supervisor gave a poor evaluation solely because an employee raised a complaint, that would be evidence of retaliation under the company's policies. *See* [34-5] at 26–32; [39] ¶ 5. Supervisors or managers who received a complaint or had notice of discriminatory behavior were obligated to report to the employee relations department so that an investigation and corrective actions could take place. [39] ¶ 4.

Accenture told employees who made complaints about discrimination to remove themselves from the client project where the discrimination was occurring until the conclusion of any investigation. [39] ¶ 6. Company policy said that bench timelines should be extended for employees who weren't working on a client project as a result of making a complaint about discrimination. *Id.* ¶ 7. Accenture leadership and employee relations staff could extend the bench timelines or recommend an

extension, giving employees who alleged discrimination more time to look for their next project. *See id.*

### B.    Johnson's Employment

Jeffery Johnson, who was Black, began working at Accenture in January 2018. *See* [28] ¶¶ 2–3; [39] ¶ 1. Experienced in software development and warehouse management, Johnson was hired as a Level 8 Application Development Associate Manager. *See* [28] ¶¶ 2–3; [39] ¶ 1. His work was overseen by Managing Director Katherine McQuin, who led Accenture's Midwest consulting practice and was responsible for the staffing of projects. [39] ¶ 2.[3]

At his first three projects at Accenture, Johnson wasn't discriminated against either as part of the hiring process or during his work. [28] ¶¶ 15, 17, 19. Following those three projects, Johnson spent time on the bench: approximately two weeks after his first project, some period of time after the second, and about three months following his third project. *Id.* ¶¶ 16, 18, 20. Johnson knew that while he was on the bench he was responsible for finding a new project. *Id.* ¶ 10. He also knew that employees who spent long periods on the bench would be fired. *Id.* Lisa Quiroz, a talent fulfillment specialist, was assigned to help Johnson find more work. *See id.* ¶ 13; [39] ¶ 10. During Johnson's third period without a project, and after he had been on the bench for more than two months, Quiroz held a checkpoint discussion during

---

[3] The records cited by plaintiff don't show that McQuin was responsible for staffing Accenture employees Michael Hancock, Richard Noble, Nishant Jain, Jason Rowe, Paul Van Kraij, Jeffrey Landherr, and Michele Ho. *See* [34-4] at 8, 12–17; [39] ¶ 2. McQuin served as a career counselor for Jain. [39] ¶ 3.

which she reminded Johnson of the need to focus on finding more client work, told Johnson that she was proposing him for open roles, and warned that if they couldn't find another project in the coming weeks, the company would move Johnson within the company or fire him. *See* [28] ¶ 21.

In February 2019, Johnson found another project (his fourth), performing work on behalf of Client A.[4] *See* [28] ¶ 22; [39] ¶ 12. In its initial assessment, Accenture decided that Client A needed a solution called extended warehouse management, and assigned an employee to the project who had experience in that part of the company's business. [28] ¶ 23. Once the project was underway, however, Accenture decided that the client actually needed an older version of its warehouse management, which required a different skillset. *Id.* ¶ 24. The assigned employee (who was Black) was removed. *See id.* ¶¶ 25–26; [39] ¶¶ 12, 14. There's a dispute as to why that employee left the Client A project. According to a senior manager, the assigned employee didn't have experience with the relevant area of Accenture's business, wanted to continue her work in extended warehouse management, and she and the company agreed that she would leave the project. [28] ¶¶ 25–26.[5] But another manager said that the

---

[4] Defendant has shown that the identity of its clients is competitively sensitive information. *See* [30]; [31]. The names of Accenture's clients are not material to the motion for summary judgment, and so I refer to the clients mentioned in this opinion by way of pseudonyms (Client A, Client B, etc.).

[5] Plaintiff's hearsay objection is overruled. The assertions at issue were made by the senior manager, explaining what he understood to be the employee's reasons for leaving the project. *See* [28-4] at 71–72. The senior manager had personal knowledge of the project's staffing needs. Whether his testimony was based on any assertions by the employee goes to the probative value of this evidence, and isn't a reason to exclude his testimony now. It is offered only to show the stated reasons for the departure.

employee had been removed because she was inadequate and not smart enough to do the job. [39] ¶ 14.

To replace the reassigned employee, Accenture chose Johnson. *See* [28] ¶ 26; [39] ¶ 12. Johnson began work on the Client A account on or about February 18, 2019. *See* [28] ¶ 27; [39] ¶ 12. That day, however, Johnson began to suspect that he was being subjected to racism. [28] ¶ 27. Johnson suspected racism because a manager told him that his immediate predecessor was inadequate and not smart enough for the job, the same manager told Johnson to "tread lightly" around a German woman who worked for the client, and Johnson believed that an Accenture employee refused to serve as his administrative assistant because he was Black. *See* [28] ¶¶ 27–29, 31; [28-3] at 48; [39] ¶¶ 13–14.

Johnson called Accenture's HR department. *See* [28] ¶ 30. He also reported to Quiroz his concerns about the manager's comments. [39] ¶ 15. Despite his suspicions, Johnson continued to work on the Client A project for four weeks. *See* [28] ¶ 32; [39] ¶ 15. During that time, he determined that one of the client's employees was a racist. [28] ¶ 32. The Client A employee was combative, angry, and disrespectful with Johnson, but not with others. *See* [28] ¶ 33; [39] ¶ 15.[6] Johnson believed that the client's employee didn't like that a Black man was in a lead role on the project. *See* [39] ¶ 15; [28] ¶ 39; [28-3] at 83.

---

[6] Johnson also suspected racism because of the client employee's nationality. [28] ¶ 35. On at least one occasion, the Client A employee yelled at the entire team. *See* [28] ¶ 34; [28-3] at 83, 87.

7

On March 14, Johnson reported his concerns about the client's employee to Rick Noble, a senior manager at Accenture who was also assigned to the project. *See* [28] ¶ 37; [39] ¶ 16.[7] In his discussion with Noble, Johnson never mentioned race discrimination. *See* [28] ¶ 37; [28-4] at 159.[8] Noble told Johnson that the client's representatives had been intimidated by Johnson's deep voice, and advised Johnson to raise his voice a few octaves to accommodate the client. *See* [39] ¶ 16; [28] ¶ 38.[9] Johnson believed that the client was biased against him because he was Black and charged with leading the project, not because of his voice. *See* [39] ¶ 16. Johnson believed that Noble's comment about his voice was itself racist. *See id.*; [28] ¶¶ 38–39.

On March 18, Johnson called Accenture's employee complaint hotline and reported that he had been subjected to a hostile work environment and discrimination based on his race. [39] ¶ 17. Johnson's complaint included the negative comments made about his predecessor's work, the client employee's combative and disrespectful

---

[7] Johnson also reported the problem to his mentor at Accenture. [39] ¶ 16.

[8] Plaintiff fails to controvert the asserted fact—that Johnson didn't mention race discrimination to Noble. *See* [33] ¶ 37. The cited portions of Johnson's deposition haven't been filed on the record, and the selections of the testimony that have been filed don't show that Johnson complained about racist treatment. *See* [28-3]; [34-2]. That Noble told Johnson to raise the pitch of his voice when speaking with the client isn't evidence that Johnson complained to Noble about racism or that Noble acknowledged that the client's employee was biased against Johnson based on his race. *See* [39] ¶ 16. The asserted fact, [28] ¶ 37, is admitted.

[9] Johnson said that the pitch of a person's voice was not necessarily indicative of their race. *See* [28] ¶ 39. Noble sat in on some meetings with Johnson and the client, but didn't see any unfair treatment. *Id.* ¶ 37.

behavior, and Noble's suggestion that Johnson raise the pitch of his voice so as to accommodate the client. *Id.*; *see* [34-8] at 4.[10]

Johnson didn't go to work on March 18, and instead sent an e-mail to Noble. [28] ¶ 40.[11] Johnson didn't report for work because he could not tolerate the hostility from the client's employee, because of Noble's failure to address the situation and apparent endorsement of discrimination, and because Johnson had already filed a complaint and had been told by Accenture staff not to return to the project. [39] ¶ 18. Although Noble believed Johnson didn't have deficiencies in his work, Noble did not complete an evaluation of Johnson for the Client A project. *Id.* ¶ 24; [28] ¶ 69.

Following up on Johnson's complaint, a manager with the company spoke to Johnson. *See* [28] ¶ 42; [39] ¶¶ 19–20. The company also interviewed Noble, and informed him of the specifics of Johnson's complaint. *See* [39] ¶ 19. The manager investigated Johnson's concerns, found that they were without merit, and closed the matter. *See* [28] ¶ 43; [39] ¶ 21. She thanked Johnson for bringing his concerns to the company's attention and told him that Accenture didn't tolerate retaliation. *See* [28] ¶ 43.

---

[10] The record doesn't support the proposition that Johnson told HR that the client team was intimidated by having a Black man leading their project. *See* [39] ¶ 17; [28-3]; [34-2]; [34-8].

[11] Johnson told Noble that he had decided to contact HR about his experience on the project and wasn't comfortable working in an unhealthy environment. [28] ¶ 40. Noble responded that he believed the team had been heading in the right direction, was disappointed that Johnson hadn't reported to work, and that Johnson's absence had put Noble in a tough spot. *Id.* ¶ 41.

After leaving the Client A project, Johnson returned to the company's bench. [28] ¶ 44.[12] After three weeks on the bench, company guidelines said that Quiroz should have held a checkpoint discussion with Johnson. *Id.* ¶ 45. Before scheduling that meeting, however, Quiroz asked Accenture's employee relations office whether she should wait longer. *Id.* To ensure that Johnson didn't experience adverse effects from his work on the Client A project, employee relations told Quiroz to give Johnson extra time and to postpone their discussion. *Id.* After Johnson had been on the bench for six weeks, Quiroz held the checkpoint discussion about the need for him to be staffed on a client project as soon as possible. *Id.* ¶ 46. Accenture again gave Johnson additional time on the bench, and he ultimately remained without work for about two months after leaving the Client A project. *See id.* ¶¶ 44, 47.

In late April 2019, Project Manager Nishant Jain contacted Johnson about an opportunity with Client B, contingent on feedback about Johnson's performance on the Client A project. *See* [39] ¶ 25.[13] Jain told Johnson to prepare for travel and that

---

[12] As part of the investigation into his complaint, Johnson twice told the investigating manager that he was willing to return to the Client A project. [39] ¶ 22. But no one at the company contacted Johnson about returning to the project, or told the Client A project leaders that Johnson should be reinstated. *Id.* Instead, the investigator and Quiroz said that Johnson should find another opening in the company. *Id.* The Client A project had been scheduled to last at least through the end of 2020. *Id.* ¶ 23. But there's no evidence supporting Johnson's assertion (made in a declaration) that he wouldn't have been sent to the company's bench before that time had he been reinstated on the project. *See id.*; [34-10] ¶ 10. Without a showing of some factual basis for his assertion, Johnson's statement is merely speculation and isn't evidence that can withstand summary judgment. *See Austin v. Walgreen Co.*, 885 F.3d 1085, 1089 (7th Cir. 2018).

[13] There's a dispute as to whether Jain told Johnson that he had been selected for the project or was merely being considered for the role. *See* [39] ¶ 25; [41-1] ¶ 5; [34-10] ¶ 11.

10

he would be starting work as soon as possible. *Id*. Jain said that the project would have taken at least a year. *Id*.[14]

On April 29, Jain requested information about Johnson's performance on the Client A account from Managing Director Michael Hancock. [28] ¶ 72; *see* [28-4] at 17; [39] ¶¶ 25–26. In a separate e-mail thread, Hancock asked Noble whether Johnson was "the guy that walked out" and Noble said yes. *See* [28] ¶ 73; [28-4] at 17; [39] ¶ 27.[15] Hancock told Jain that Johnson had only worked on the Client A account for a couple of weeks, and had "walked off the project," leaving the company "in a bad spot with the client." *See* [28] ¶ 73; [34-12] at 3; [39] ¶ 27. At the time, Hancock didn't know that Johnson had complained about racial discrimination. [28] ¶ 74.[16]

On the basis of Hancock's comments, Jain sought other candidates for the opening on his team. [28] ¶ 75. After seeing Hancock's message, McQuin instructed

---

[14] Plaintiff's assertion that had he been selected for the Client B project he would not have been sent to the Accenture bench before mid-2020 is inadmissible speculation. *See* [39] ¶ 25; [34-10] ¶ 11; *Austin v. Walgreen Co.*, 885 F.3d 1085, 1089 (7th Cir. 2018).

[15] Noble knew that Johnson had filed a complaint with the company about his work on the Client A project. *See* [28] ¶ 40; [39] ¶ 19. Johnson argues that Noble's answer to Hancock was misleading because Noble didn't tell him about the circumstances of Johnson's departure from that project, *see* [28-4] at 17; [34-9] at 139, 144–46, but the records cited don't show that Noble knew Johnson had been told to leave the project by Accenture's employee relations team. *See* [39] ¶¶ 27–28; [34-4] at 39–51; [34-9] at 123–147; [34-11] at 73–91, 94–98, 121–23. Noble was contacted by other managers seeking his opinion about Johnson's performance, but couldn't remember which managers he spoke with. *See* [39] ¶ 34. According to Noble, when asked about Johnson's performance on the Client A project, he only confirmed that Johnson had worked on the account and did not comment on plaintiff's performance. *See* [28] ¶ 71. With the exceptions of Noble's e-mail to Hancock and his own account of what he said to other managers, there is no other evidence as to what Noble told managers about Johnson, or that Noble prevented Johnson from securing project work. *See* [39] ¶¶ 36–37; [34-9] at 149–57; [34-15]; [34-4] at 17–20, 56–60; [28-3].

[16] While an incomplete description of the events that lead to Johnson's departure from the Client A project, the records cited don't show that what Hancock said to Jain was false. *See* [39] ¶ 27; [34-4] at 39–51; [34-9] at 123–147; [34-11] at 73–91, 94–98, 121–23; [34-12].

Jain to reach out to Johnson's supervisor on a different project, and said that there were extenuating circumstances related to Johnson's performance on the Client A project. [28] ¶ 77; [34-12] at 7.[17] Jain received positive information about Johnson's performance from a different supervisor. [28] ¶ 78. Jain ultimately didn't choose Johnson for the open position, and explained that while he had received positive information about plaintiff, he chose another employee who had an existing relationship with the client. *Id*. ¶ 79.[18]

Without the assistance of McQuin or Quiroz, Johnson joined a fifth Accenture project in early May 2019, working for Client C. *See* [28] ¶ 48; [39] ¶ 33.[19] After

---

[17] Quiroz prompted McQuin to explain that there were extenuating circumstances, and noted that the company's employee relations team was worried that Johnson would see negative feedback about the Client A project as retaliation. *See* [28] ¶ 76; [34-12] at 5. There's no evidence that McQuin and Quiroz condoned Hancock's incomplete description of Johnson's participation on the Client A project. *See* [39] ¶ 29; [34-4] at 39–51; [34-9] at 123–147; [34-11] at 73–91, 94–98, 121–23; [34-12]. Instead, the evidence shows that when they learned about Hancock's message, McQuin and Quiroz decided to downplay Johnson's experience at Client A and McQuin told Jain to seek information about Johnson's performance from another project. *See* [34-12] at 5, 7.

[18] Plaintiff's hearsay objection is overruled. What Jain told Quiroz about his reasons for hiring a different candidate are covered by the exception for a then-existing state of mind. *See* Fed. R. Evid. 803(3). The records cited by plaintiff don't show that Hancock's message was the reason Johnson wasn't selected for the job. *See* [39] ¶ 29; [34-4] at 39–51; [34-9] at 123–147; [34-11] at 73–91, 94–98, 121–23; [34-12]. McQuin and Quiroz didn't recommend that Jain reconsider his choice of another candidate for the position, tell Noble to correct his description of Johnson's time on the Client A project, or share e-mail exchanges about Johnson's rejection with Johnson or anyone else at the company, including Accenture's diversity and inclusion representatives. *See* [39] ¶¶ 30–32, 38. Messages between Quiroz and other Accenture employees show that the company was concerned that putting pressure on Johnson to secure a project would be seen as retaliation. *See* [39] ¶ 31; [34-6] at 2. Someone from employee relations told Quiroz to focus on finding Johnson a project and to delay the usual bench timeline. *See* [39] ¶ 31; [34-6] at 2.

[19] Johnson was hospitalized for a heart issue related to stress in late April or early May, and a second time for work-related stress in September. *See* [39] ¶ 31; [34-11] at 83–84; [34-6] at 5, 8–9. Company policy said that bench timelines were to be extended for employees who

working on that project for eight days, Johnson was removed for performance reasons. *See* [28] ¶ 48. A senior manager wrote that Johnson was taken off the project because he flew home without advance notice, was reluctant to cooperate, asked for time off, created sub-standard presentation materials, failed to communicate effectively, and wasn't proactive. *Id.* ¶ 49.[20] Johnson returned to the bench for more than five weeks. *Id.* ¶ 50. Despite the short amount of time that Johnson had spent on his latest project, the company reset his bench clock to zero, as if he had departed a long-term project. *Id.*; *see* [39] ¶ 33.[21] Quiroz held another meeting with Johnson and encouraged him to identify roles that matched his skillset. *See* [28] ¶ 51.

Johnson joined a project with Client D, and performed well. *See* [28] ¶ 52; [39] ¶ 33. He returned to Accenture's bench on August 26, 2019. *See* [28] ¶ 52. E-mails between Accenture project managers show that Johnson was disqualified from at least one project in August because of his time on the Client A account. *See* [39] ¶ 35; [34-15]; [34-4] at 57–60; [34-9] at 149–56.[22] Johnson did not find another project at the company, and spent nearly three months on the company bench. [28] ¶ 53.

---

needed medical leave because of health problems related to a discrimination complaint or resulting retaliation. *See* [39] ¶ 8.

[20] Johnson said that there was a misunderstanding about his travel plans. *See* [39] ¶ 33; [28-3] at 149. He believed that the Client C project manager was working against him. *See* [28] ¶ 68; [28-3] at 145–47.

[21] That Johnson's bench clock was reset isn't evidence that he was wrongfully removed from the Client C project. *See* [39] ¶ 33; [28] ¶¶ 48, 50. The records cited by plaintiff show that someone from employee relations recommended that the bench clock be reset, but don't explain why that decision was made. *See* [39] ¶ 33; [34-14] at 2–6; [34-11] at 100–02.

[22] There's no evidence that the mangers at issue knew about Johnson's discrimination complaint about the Client A project, or that Johnson was permanently disqualified from project work, either with these managers or others at the company. *See* [39] ¶ 35; [34-9] at 38–41, 50–51, 62–63, 143–157; [34-15], [34-4] at 17–21, 56–60.

13

Quiroz continued to coach Johnson, attempting to find him work. *See* [28] ¶¶ 54–55.[23] In October, Johnson complained that he had not been selected for project work out of retaliation, but McQuin and Quiroz didn't investigate that complaint, tell anyone else about it, or extend Johnson's time on the bench. *See* [39] ¶ 39. Quiroz followed up with opportunities that Johnson pursued, and gave Johnson updates on the reasons why he was not selected. [28] ¶ 56. No hiring manager told Quiroz that Johnson was rejected for discriminatory reasons, or said that they were aware that Johnson had previously complained about discrimination. *Id.*[24] After Johnson had been on the company's bench for seven weeks, McQuin warned that if he failed to find work soon, Johnson could be fired. [28] ¶ 58.

Two weeks later, the company issued Johnson a notice of termination. [28] ¶ 59. Senior Managing Director Pallavi Verma made the call to fire Johnson, and an Accenture employee presenting the decision to Verma noted that Johnson had spent long periods of time not performing client work, including more than half of fiscal

---

[23] Quiroz identified ways for Johnson to improve his resume, including removing the Client C project so as to avoid prompting managers to inquire about his performance on that project. [28] ¶ 57. But neither McQuin nor Quiroz recommended to any hiring managers that Johnson should be selected. *See* [39] ¶¶ 31–32, 38. Quiroz never intended to sabotage plaintiff's work at the company. [28] ¶ 55. Based on e-mails and a sense that Quiroz was upset when he found a project to work on, however, Johnson believed that she, Noble, and others at the company prevented him from being staffed on client projects. *Id.* ¶¶ 65–66.

[24] Plaintiff's hearsay objection is overruled. The assertion made by Quiroz in her declaration isn't hearsay, for the reasons discussed above at n.2. *See* Fed. R. Civ. P. 56(c)(4); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). What the hiring managers *didn't tell* Quiroz isn't hearsay because those underlying non-statements aren't assertions. *See* Fed. R. Evid. 801(a) (a person must intend to make an assertion for it to qualify as a "statement" under the hearsay rule). Silence can be an assertion when someone adopts the statement of another, *see* Fed. R. Evid. 801(d)(2)(B); *United States v. Ward*, 377 F.3d 671, 675–76 (7th Cir. 2004) (citations omitted), but there's no evidence that the managers in question adopted any statements.

year 2019. *See* [28-6] at 17–18; [28] ¶ 60.[25] McQuin spoke to Johnson on November 1, and informed him that he had two weeks to find another position within Accenture or else would be fired. [28] ¶ 61. Johnson didn't find another job within the company, and was fired on November 15. *Id.*[26]

## III. Analysis

### A. Discrimination

Section 1981 of the Civil Rights Act of 1866 protects the right to make and enforce contracts regardless of race. *See* 42 U.S.C. § 1981; *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 411 (7th Cir. 2018) (quoting *Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015)). Similarly, Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating with respect to the termination, compensation, terms, conditions, or privileges of employment because of a person's race or color. *See* 42 U.S.C. § 2000e-2(a)(1); *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022). Under both laws, the standards for proving discrimination are largely the same. *See Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th

---

[25] The record cited doesn't show why Verma made the decision—just the reasons as presented to her by others in the company. *See* [28] ¶ 59; [28-6] at 17–18. In recommending the termination, an employee wrote that Johnson had spent too long on the bench, had been challenging and difficult with staff, and had received poor feedback on some of his work. *See* [28-6 at 18]. Johnson didn't know of any Accenture employees who were on the bench longer than he was who were not terminated. [28] ¶ 62. The company fired 115 employees at Johnson's level in 2019 for failure to work on client projects for extended periods of time. *Id.* ¶ 63. At least seven those fired Accenture employees were Black. *Id.* Johnson didn't know of any specific instances of racism in the staffing process of any other Accenture consultants. *Id.* ¶ 80.

[26] Johnson filed a charge with the Equal Employment Opportunity Commission on July 16, 2020, alleging race discrimination and retaliation. [28] ¶ 64.

15

Cir. 2022) (citing *McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783, 788 (7th Cir. 2019)).[27]

The key question is whether a reasonable factfinder could conclude that Accenture took an adverse employment action against Johnson because of his race. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016); *Lewis*, 36 F.4th at 760 (citations omitted). One way of proving discrimination is the burden-shifting framework created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *See Oliver*, 893 F.3d at 411–12; *Runkel*, 51 F.4th at 742–43. Under that approach, Johnson must make a prima facie case of discrimination. *See Igasaki v. Illinois Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 601–02 (7th Cir.), *reh'g denied* (July 31, 2020)). If he does, Accenture must then offer a nondiscriminatory motive for its action, which can be rebutted if Johnson shows that the stated reason was a pretext for discrimination. *See Lewis*, 36 F.4th at 760 (citing *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020)). Under either the *Ortiz* or *McDonnell Douglas* approach, I evaluate all of the evidence as a whole. *Ortiz*, 834 F.3d at 766.

Johnson has three theories of discrimination. *See* [37] at 5–7. First, he argues that Accenture subjected him to a hostile work environment while he was a part of the Client A project. *See id.* at 6. Second, Johnson contends that the company failed

---

[27] The causation requirements for discrimination claims under Title VII and § 1981 are different. Under Title VII, race must be a "motivating factor in the defendant's challenged employment decision." *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (quoting *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1017 (2020)). To prove causation under § 1981, however, a plaintiff must show that race was a but-for cause of the injury. *Id.* (quoting *Comcast Corp.*, 140 S. Ct. at 1014).

to reinstate him on that project because he was Black. *See id.* at 6–7. Third, Johnson argues that his termination from the company was discriminatory. *See id.* at 7.

The first two of these theories center on Johnson's time working on the Client A project in February and March 2019. *See* [28] ¶¶ 27, 40, 42; [39] ¶¶ 12, 16–17, 22. Because those events occurred more than 300 days before Johnson filed his discrimination charge with the EEOC (on July 16, 2020), *see* [28] ¶ 64, plaintiff's Title VII discrimination claim cannot be based on that conduct. *See* 42 U.S.C. § 2000e-5(e)(1); *Palmer v. Indiana Univ.*, 31 F.4th 583, 588 (7th Cir. 2022) (citations omitted).[28] There's no dispute that the company's actions related to the Client A project can support Johnson's § 1981 discrimination claims. *See* [27] at 13 n.2.

While Accenture argued the discrimination claims through the burden-shifting framework, *see* [27] at 10–14, plaintiff never framed his claims that way, *see* [37] at 3–7, and waived argument that he could show a prima facie case of discrimination. *See Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (describing the four elements of a prima facie case of employment discrimination); *Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022) (undeveloped arguments are waived). What matters, then, is whether a jury could conclude, based on all of the evidence, that Accenture took an adverse action against Johnson because of his race.

---

[28] By failing to explain how Accenture concealed the basis for his claims, Johnson waived any argument for estoppel or equitable tolling. *See* [37] at 2 n.1; *United States v. Butler*, 58 F.4th 364, 368 (7th Cir. 2023) (citations omitted). Johnson's statements of fact include unsupported assertions that McQuin and Quiroz concealed e-mails from him and others at the company. *See, e.g.*, [39] ¶ 30. But the e-mails in question weren't related to the Client A project, and there's no evidence that McQuin or Quiroz were obligated to share the communications with Johnson or anyone else.

*See Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

        1.      *Hostile Work Environment*

To succeed on a hostile work environment theory under § 1981, Johnson must show that (1) the work environment was subjectively and objectively offensive, (2) race was the cause of the harassment, (3) the conduct was severe or pervasive, and (4) there is a basis for employer liability. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) (citing *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010)); *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813–14 (7th Cir. 2022) (citation omitted). Whether offensive conduct is severe and pervasive depends on things like the existence of racial animus, the frequency and severity of improper conduct, whether the conduct was physically threatening or humiliating (as opposed to merely offensive utterances), and whether it unreasonably interfered with the employee's work performance. See *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

Johnson makes no argument as to how the facts of his case apply to that legal standard. *See* [37] at 6. Even if he hasn't waived this undeveloped theory of discrimination, however, there's no evidence of a hostile work environment. The facts are that a manager at Accenture told plaintiff that his predecessor on the Client A project (who was also Black) had been removed because she was inadequate and not

smart enough to do the job. *See* [39] ¶¶ 12, 14. The same manager also told Johnson to tread lightly around one of the client's employees, who was subsequently disrespectful and combative towards Johnson but not towards other employees on his team. *See* [28] ¶¶ 27, 32–33; [39] ¶ 15. Johnson told his supervisor, Noble, about his problems with the client's employee, and Noble recommended that Johnson raise the pitch of his voice to accommodate the client. *See* [28] ¶¶ 37–38; [39] ¶ 16.

Taken together, this conduct wasn't severe or pervasive. There was no explicit racial animus in the comments about Johnson's predecessor, instruction to tread lightly around the client, the client's behavior, or Noble's suggestion that Johnson raise the pitch of his voice.[29] While being berated by a client may have been humiliating, Johnson was never physically threatened while serving on the project. Johnson was removed from the situation by filing a complaint, *see* [39] ¶ 17, but there's no evidence as to how these comments interfered with the performance of his duties. The handful of offensive comments at issue weren't clearly connected to Johnson's race, and no jury could find that this conduct was severe or pervasive. *See Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 648–49 (7th Cir. 2011) (citations omitted) (isolated incidents aren't actionable); *Peters v. Renaissance Hotel Operating*

[29] While Johnson believed that another employee declined to serve as his administrative assistant because of his race, *see* [39] ¶ 14, there's no evidence that the employee actually made that choice. What Noble said about Johnson's voice—which didn't reference Johnson's race or accent—is distinguishable from the facts in *Gold* and *Akouri*, when comments about a person's accent were evidence of discrimination. *Cf. Stuart Gold v. FedEx Freight East, Inc.*, 487 F.3d 1001, 1006, 1009 (6th Cir. 2007) (an employee was told that he couldn't become a supervisor because of his "Hispanic speech pattern and accent"); *Akouri v. State of Florida Dep't of Transp.*, 408 F.3d 1338, 1347–48 (11th Cir. 2005) (an employee was told he wasn't promoted because subordinates were white and wouldn't take orders from the employee, "especially if you have an accent").

19

*Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (a handful of offensive comments weren't sufficient to raise a jury issue).

Plaintiff has not marshaled the evidence to allow a jury to find that defendant discriminated against him by subjecting him to a hostile work environment.

### 2. Failure to Reinstate on the Client A Project

Johnson was told to leave the Client A project while the company investigated his complaint. *See* [39] ¶ 18. After the investigation was complete, Johnson told the company's investigator that he was willing to return. *See id.* ¶ 22. But the company never reinstated him, *see id.,* and instead Johnson went on the company's bench, where he received his full pay and benefits and looked for another project. *See* [28] ¶¶ 9, 44.

An adverse action under § 1981 is "some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference," and can involve the plaintiff's wealth, career prospects, or significant negative change in the workplace. *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) and *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016)). Not everything that makes an employee unhappy is an adverse action. *See Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). For instance, a transfer "involving no reduction in pay and no more than a minor change in working conditions" doesn't

20

count. *Madlock*, 885 F.3d at 470 (quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)).

Being relegated to Accenture's bench didn't change Johnson's compensation or benefits. *See* [28] ¶ 9. It didn't constitute a significant change of responsibilities, either. Johnson's job at the company was to work on client projects when he was assigned to them and to look for the next project when he wasn't. *See* [28] ¶¶ 3–6. By leaving the Client A project, plaintiff's day-to-day work changed, but that wasn't a change in his responsibilities. There are cases when a change (even one that doesn't impact an employee's finances) significantly harms an employee's career prospects by preventing him from using his skills and experience. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 787–88 (7th Cir. 2008) (quoting *Nichols*, 510 F.3d at 780). Johnson's situation wasn't like that, however, because placing Johnson on the bench wasn't a demotion in form or substance: it was merely a minor change in working conditions, a temporary inconvenience that isn't actionable as discrimination.[30]

Even if Johnson could show an adverse action based on the company's refusal to return him to the Client A project, there's no evidence that Accenture refused to reinstate Johnson because he was Black. Johnson was initially removed from the project to allow an investigation to happen. *See* [39] ¶ 18. After the investigation, employee relations and Quiroz told Johnson to look for work with a different client.

---

[30] That Johnson secured more project work at the company after being placed on the bench, *see* [28] ¶¶ 48, 52, shows that refusing to reinstate him to the Client A project didn't stymie his career with the company.

21

*See id.* ¶ 22. On this record, there's no evidence that the company chose not to return plaintiff to the Client A project because of his race.

Johnson's second theory of discrimination fails because he hasn't shown either adverse action or causation.

### 3. Termination

Johnson argues that if he had been reinstated to the Client A project (or hadn't been told to leave that project), he never would have been sent to the company bench and ultimately fired. *See* [37] at 7. Under either § 1981 or Title VII, being fired is an adverse action. *See Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 235 (7th Cir. 2014) (quoting *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007)). But Johnson's third theory of discrimination fails because he can't show that the company fired him because of his race.

As discussed above, there's no evidence that Johnson was sent to the bench after the Client A project or that the company refused to reinstate him to that project because he was Black. There's also no admissible evidence that, but for Johnson's removal from the project in March 2018, he wouldn't have been sent to the bench. Johnson's unsupported assertion to that effect—*see* [39] ¶ 23; [34-10] ¶ 10—is merely speculation. *See Austin v. Walgreen Co.*, 885 F.3d 1085, 1089 (7th Cir. 2018). Johnson was told not to return to a project that made him uncomfortable, and was ultimately fired for spending too much time not working on client projects. *See* [28] ¶¶ 59–61. While plaintiff's termination was an adverse action, there's no evidence that the company fired him because of his race.

The evidence does not support any of Johnson's discrimination theories. Defendant's motion for summary judgment as to Counts One and Three is granted.

## B.    Retaliation

Courts use the same standards to review retaliation claims under § 1981 and Title VII. *See Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (citation omitted); *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) (citation omitted). Both laws prohibit employers from retaliating against employees because they complained of discrimination. *See Baines*, 863 F.3d at 661; *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451–52 (2008); 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 1981(a). To survive summary judgment on these retaliation claims, a jury must be able to conclude that (1) Johnson engaged in protected activity, (2) he suffered an adverse employment action, and (3) Accenture took the adverse action because of his protected activity. *See Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 761 (7th Cir. 2022) (citing *Rozumalski v. W.F. Baird & Associates, Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019)).

It's undisputed that Johnson's complaints about the Client A project were protected activity. *See* [27] at 15. Plaintiff argues that the company took four adverse actions: (1) failing to reinstate him to the Client A project, (2) failing to reinstate him to the Client C project, (3) denying him selection for the Client B project, and (4) denying him selection for other projects and terminating his employment. *See* [37] at 7–8.[31] An adverse action for a retaliation claim is one that might dissuade a

---

[31] Because the events underlying the first three of Johnson's theories of retaliation occurred more than 300 days before he filed his charge with the EEOC, plaintiff can pursue those theories only under § 1981 (not Title VII). *See* [28] ¶¶ 27, 42, 48, 50, 64; [39] ¶¶ 25–27; 42

reasonable employee from engaging in protected activity. *See Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911–12 (7th Cir. 2022) (quoting *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016)). Defendant doesn't dispute that these actions qualify under that standard, *see* [38] at 9, and so the issue is causation.

Plaintiff must show that the company would not have taken an adverse action against him but for his protected activity. *See Baines*, 863 F.3d at 661 (quoting *Greengrass v. Int'l Monetary Systems Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)); *Cung Hnin v. TOA (USA) LLC*, 751 F.3d 499, 508 (7th Cir. 2014) (quoting *Reynolds v. Tangherlini*, 737 F.3d 1093, 1104 (7th Cir. 2013)). Johnson can show causation through admissions of retaliatory animus or with circumstantial evidence such as suspicious timing, ambiguous statements of animus, evidence that other employees were better treated, or by showing that Accenture's stated reason for taking an adverse action was pretextual. *See Baines*, 863 F.3d at 661; *Lewis*, 36 F.4th at 761 (quoting *Rozumalski*, 937 F.3d at 924).

### 1. Client A

Johnson wasn't reinstated to the Client A project in the weeks after he complained about harassment. *See* [39] ¶ 22; [28] ¶¶ 40, 44. The proximity of that decision to the complaint is some evidence—in the form of suspicious timing—of retaliation. But timing alone is rarely enough. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014) (citation omitted). Johnson hasn't identified who

---

U.S.C. § 2000e-5(e)(1); *Palmer v. Indiana Univ.*, 31 F.4th 583, 588 (7th Cir. 2022) (citations omitted); *Brown v. Chicago Transit Auth. Pension Bd.*, 86 Fed. App'x 196, 198 (7th Cir. 2004).

refused to reinstate him. The company's investigator and Quiroz told Johnson to find another opening in the company, rather than return to the project. *See* [39] ¶ 22. Assuming that they made the decision not to reinstate Johnson, there's no evidence that either Quiroz or the investigator had any retaliatory animus based on Johnson's protected conduct. And there's no evidence that anyone else sought to retaliate against Johnson by refusing to put him back into a situation that he found intolerable.

In his response brief, Johnson references the cat's paw doctrine, but doesn't explain how it applies in this case. *See* [37] at 5, 7. The cat's paw doctrine applies when a biased employee without decision-making power "uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 573–74 (7th Cir. 2021) (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)); *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461–62 (7th Cir. 2021). To show causation under the cat's paw theory, a plaintiff must prove that (1) an employee actually harbored retaliatory animus against him, and (2) the subordinate's scheme proximately caused the adverse action. *See Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018) (citation omitted).

With regard to Client A, perhaps Johnson is arguing that Noble was the biased employee in question. Noble was interviewed by the company's investigator about Johnson's claim and knew about Johnson's complaint. *See* [28] ¶¶ 40, 42; [39] ¶¶ 19–20. That Noble's comment about Johnson's voice was part of the basis for plaintiff's complaint doesn't mean that Noble had motive to retaliate against plaintiff.

25

Similarly, Noble was disappointed about Johnson not reporting to work, *see* [28] ¶ 41, and didn't evaluate Johnson's performance on the project, *see* [39] ¶ 24; [28] ¶ 69, but neither of those actions shows that Noble was angry about Johnson having filed a complaint. The bottom line is that there's no evidence that Noble was biased against Johnson because of his protected activity, or that Noble did anything that caused the company not to reinstate Johnson. Plaintiff hasn't shown either of the two elements of the cat's paw doctrine, and so this theory of causation doesn't hold up. *See Sinha*, 995 F.3d at 574.

Johnson can't show that his complaint caused the company to deny him reinstatement to the Client A project.

### 2. Client B

Johnson was selected to work with Client B, contingent on feedback about his performance on the Client A project. *See* [39] ¶ 25. When asked by another employee (Hancock) whether Johnson had walked out on the project, Noble said yes. *See* [28] ¶ 73; [39] ¶ 27. Hancock told the project manager (Jain) that Johnson had walked out of the Client A project leaving the company in a bad spot with the client, and Jain sought other candidates for the position. *See* [28] ¶¶ 73, 75; [34-12] at 3; [39] ¶ 27. McQuin, prompted by Quiroz, told Jain to seek different feedback on Johnson because of extenuating circumstances. *See* [28] ¶¶ 76–77. Jain followed that instruction, got better information about Johnson, but ultimately chose another candidate for the job because that person had an existing relationship with the client. *See* [28] ¶¶ 78–79.

Johnson argues that Noble used Hancock and Jain to get back at him. *See* [37] at 9. There are several problems with that theory. First, the facts are that Jain didn't choose Johnson because he found a better candidate, not because of what Noble told Hancock. *See* [28] ¶¶ 78–79. That means that Noble's actions weren't the proximate cause of Johnson's failure to secure the Client B assignment. *See Sinha*, 995 F.3d at 575. Second, as discussed above, there's no evidence that Noble had any desire to retaliate against Johnson. Noble didn't fill Hancock in on the circumstances around Johnson's departure from the Client A project. *See* [28] ¶ 73; [28-4] at 17; [39] ¶ 27. But Noble answered the question he was asked, and his failure to volunteer more information about the situation doesn't show that he was biased against Johnson because plaintiff made a complaint. *See Johnson v. Koppers, Inc.*, 726 F.3d 910, 915 (7th Cir. 2013) (a false report, standing on its own, is insufficient to establish animus).[32]

Accenture didn't deny Johnson the Client B opportunity because of his complaints.

### 3. Client C

Plaintiff worked on a project for Client C for eight days in May 2019. *See* [28] ¶ 48; [39] ¶ 33. He was taken off the project for performance reasons, and a senior

---

[32] Johnson also implies that McQuin and Quiroz retaliated against him by failing to recommend that Jain reconsider his choice, instruct Noble to elaborate on the circumstances of Johnson's departure from the Client A project, or show communications about the Client B hiring process to others. *See* [37] at 9. There's no evidence that their actions were the proximate cause of plaintiff losing out on the project, however, because there's nothing to suggest that Johnson *would* have been selected had McQuin and Quiroz shared the e-mails, prompted Noble to say more, or made further recommendations.

manager explained particular faults that led to the decision. *See* [28] ¶¶ 48–49. Johnson argues that he was wrongfully removed because of a misunderstanding. *See* [37] at 10–11.[33] The apparent theory of retaliation is that, by failing to intercede on his behalf and secure his reinstatement, McQuin and Quiroz retaliated against Johnson for making complaints. *See id.*

The record doesn't show that McQuin or Quiroz had authority to reinstate Johnson to a client project, or that he would have been reinstated had they intervened. And there's no evidence that either McQuin or Quiroz harbored retaliatory animus against Johnson. Plaintiff argues that these employees concealed e-mails about the Client B opportunity from him and others at the company. *See* [37] at 10–11. But the record doesn't show that they were required to share those communications with anyone. *See* [39] ¶¶ 30–32, 38. Similarly, that McQuin and Quiroz failed to alert the company's diversity and inclusion representative about Johnson's trouble finding work, *see* [39] ¶¶ 11, 30–32, 38, isn't evidence that they sought to retaliate against Johnson for making a complaint about discrimination. When Johnson complained in October that he wasn't able to find work because he was being retaliated against, McQuin and Quiroz didn't investigate. *See* [39] ¶ 39. But there's nothing that shows that, had they investigated, Johnson wouldn't have been terminated. These employees worked closely with Johnson to find him more

---

[33] There's no evidence that the decisionmaker who removed Johnson from the project knew about his protected activity. *See Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 762 (7th Cir. 2022) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 603 (7th Cir. 2020)) ("For a superior to have retaliated against an employee based on protected activity, the superior must have had knowledge of that protected activity.").

work, and Quiroz at least was aware of the non-discriminatory reasons that he wasn't being selected for projects. *See* [28] ¶¶ 54–55, 58.[34] That they neither investigated further nor extended Johnson's bench time (after several previous extensions), *see* [39] ¶ 39, isn't evidence of retaliatory animus.

Plaintiff can't show that he wasn't reinstated to the Client C project because of protected activity.

### 4. Other Projects and Termination

Johnson argues that Noble prevented him from securing assignments at Accenture, eventually leading to his termination. *See* [37] at 11–15. Noble was asked about Johnson's performance on the Client A project by other managers, but the facts are that he confirmed to Hancock that Johnson had walked off the project and otherwise said that Johnson had worked on the account and didn't comment on plaintiff's performance. *See* [28] ¶¶ 71, 73; [39] ¶¶ 34, 36–37.[35] Other managers considered and ultimately disqualified Johnson from a project based on his experience on the Client A account, but their communications show that they disqualified Johnson for not working out on that project (not for making a complaint). *See* [39] ¶ 35; [34-15]. There's no evidence that Noble weighed in on plaintiff's candidacy, or

---

[34] E-mails between Quiroz and others in the company show that Accenture was concerned that putting pressure on Johnson to secure a project would be seen as retaliation. *See* [39] ¶ 31; [34-6] at 2. But that doesn't show that McQuin and Quiroz knew that Johnson was being retaliated against.

[35] Johnson said that, after speaking with Noble, another project manager declined to choose him for a project with Client E. *See* [28-3] at 160–61. But there's no evidence as to what Noble said to that manager or why the manager ultimately declined to staff Johnson. Similarly, the record is silent as to Noble's role (if any) in the hiring process for the assignments with Clients F or G. *See id.*; [37] at 12.

that the managers at issue knew anything about Johnson's complaint. *See* [39] ¶ 35; [34-15].

Johnson was never disqualified from all project work at the company. After his time on the Client A project, he worked on two other assignments and was considered for a third. *See* [39] ¶ 25; [28] ¶¶ 48, 52. As discussed above, there's no evidence that Noble, Quiroz, or McQuin were motivated to retaliate against Johnson, or that their actions were the proximate cause of Johnson losing out on any project or being terminated by the company.

There's a non-retaliatory reason why Johnson was fired: he spent too much time on Accenture's bench. *See* [28] ¶¶ 59–60. The company's senior managing director made the ultimate decision to fire plaintiff, relying on reasoning provided by McQuin, Quiroz, and two other employees. *See* [28-6] at 17–19; [34-17].[36] The record doesn't show that the two other employees involved in the decision were aware of Johnson's protected activity. The managing director didn't wholly depend on input from Quiroz and McQuin, *see* [28] ¶ 60; [28-6] at 17–19, Johnson hasn't shown that the other employees involved in the decision were biased against him,[37] and plaintiff

---

[36] Quiroz, McQuin, and the two other Accenture employees waited extra days after a decision had been made before telling Johnson that he was terminated so as to give Johnson the sense that the company's inclusion and diversity officer had been aware of the decision longer. *See* [34-17] at 2. While that purposeful delay may have been deceptive, it's not evidence of retaliation because these employees had already agreed that Johnson should be terminated, and there's no evidence that they reached that decision based on retaliatory animus.

[37] That these employees didn't know about Johnson's complaint means that their description of Johnson as a difficult employee who was challenging to staff, failure to swiftly inform the diversity and inclusion officer of Johnson's problems finding work, and decision to delay the termination by a few days to give Johnson the impression that that officer had known about the termination for a longer period of time isn't evidence of retaliation. *See Lewis v. Indiana*

30

has failed to show that retaliatory animus proximately caused his removal. *See Sinha v. Bradley Univ.*, 995 F.3d 568, 574–75 (7th Cir. 2021) (when a decisionmaker doesn't singularly depend on a biased perspective, proximate cause under the cat's paw theory doesn't exist).

Accenture is granted summary judgment as to the retaliation claims.

## IV. Conclusion

Defendant's motion for summary judgment, [26], is granted. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: February 14, 2023

---

*Wesleyan Univ.*, 36 F.4th 755, 762 (7th Cir. 2022) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 603 (7th Cir. 2020)) ("For a superior to have retaliated against an employee based on protected activity, the superior must have had knowledge of that protected activity.").